REED A. WATKINS AND JEANETTE D. WATKINS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Watkins v. Commissioner
Docket Nos. 4458-70, 5157-71, 177-72.
United States Tax Court
T.C. Memo 1973-267; 1973 Tax Ct. Memo LEXIS 18; 32 T.C.M. (CCH) 1260; T.C.M. (RIA) 73267; December 6, 1973, Filed Reed A. Watkins, pro se, in docket Nos. 4458-70 and 177-72. Biard E. Anderson and Geraldine Anderson, pro se, in docket No. 5157-71. Eugene P. Bogner, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined the following deficiencies in the *19 Federal income taxes of petitioners: [2] Reed A. and Jeanette D. Watkins Docket No.
Taxable Year
Deficiency Claimed in Deficiency Notice
Deficiency Claimed in Amend. to Answer 4458-70
1966
$1,751.92
$ 2,423.61
1967
1,818.28
2,540.90
177-72
1968
1,977.31
2,648.53
1969
1,282.78
1,746.67 Biard E. and Geraldine Anderson Docket No.
Taxable Year
Deficiency Claimed 5157-71
1968
$945.11
1969
769.82
Two issues are presented for disposition in these proceedings. The first issue pertains to whether the custodial parent or the noncustodial parent is properly entitled to the dependency exemptions in question. The second issue involves the determination of the proper depreciable basis and useful life of specific improvements located on real property acquired during 1965 *20 and 1966 by a partnership in which petitioner Reed A. Watkins was a participating partner during the taxable years in issue. FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Reed A. Watkins (Reed) and Jeanette D. Watkins (Jeanette) are husband and wife who resided in Salt Lake City, Utah, when they filed their petitions in the case.They filed joint income tax returns for the taxable years 1966 through 1969, inclusive, with the district director of internal revenue, Salt Lake City, Utah. Petitioners Biard E. Anderson (Biard) and Geraldine Anderson (Geraldine) are husband and wife who resided in Salt Lake City, Utah, when their petition was filed in the case herein. They filed joint income tax returns for 1968 and 1969 with the district director of internal revenue, Salt Lake City, Utah. Reed and Geraldine were married on December 14, 1951, and were divorced pursuant to an interlocutory decree entered on May 20, 1965. Reed married his present wife, Jeanette, on December 17, 1965, and Geraldine and Biard were married on April 23, 1968. Four children *21 were born during the marriage of Reed and Geraldine: Stephen, born October 18, 1952; Joseph, born July 29, 1954; Karla, born March 24, 1957; and John, born September 8, 1960. Under the terms of the decree divorcing Reed and Geraldine, custody of the children and the family home at 2551 Olympus Drive were awarded to Geraldine, and Reed was directed to pay $75 per month child support per child and $300 monthly alimony to Geraldine. Reed was also required to purchase $50,000 of decreasing term insurance, $25,000 of which was for the benefit of Geraldine and $25,000 for the children. The total premium cost of the declining term insurance was $288 per year. Upon Geraldine's remarriage, alimony, and her portion of the decreasing term insurance, were terminated and provision was made to increase monthly support per child to $100 as each child became 13 years of age. Both Reed and Geraldine claimed the four children as dependency exemption deductions on their respective income tax returns for the taxable years 1966 to 1969, inclusive. Respondent has allowed said exemptions to Geraldine and disallowed them to Reed for the taxable year 1966, but has disallowed the exemptions as to both *22 parties for 1967, 1968, and 1969.
Except during visits with Reed, the children were in the custody of, and resided with, Geraldine in the home at 2551 Olympus Drive (referred to either as the home or Geraldine's home) during the years 1966 to 1969, inclusive. Total support of the children in each of the years was furnished exclusively by Reed, Geraldine, and, after his marriage to Geraldine in 1968, Biard. Geraldine's home is located in a choice neighborhood of luxury homes in Salt Lake City. Most of the homes in the neighborhood are of above average size and value. There is an excellent view of the mountains from the front yard of Geraldine's home, particularly of majestic Mt. Olympus, which forms the eastern boundary of Salt Lake City. Geraldine's home is a block-brick rambler with a full-length covered porch, long rock planter box, and double garage. The main floor has 1,610 square feet and the basement has 1,300 square feet of space. The main floor contains three bedrooms, two baths, a fireplace, a planter, a wood-paneled family room, and a kitchen with built-in appliances; the basement contains two bedrooms with built-in shelving and desks, a recreational room with *23 a full-size pool table and fireplace, a bath, a study, two finished storage rooms, and a laundry room. The main floor is entirely carpeted, except for the kitchen and two baths. In 1968, refrigerated air conditioning and other improvements were installed in Geraldine's home. Reed and Geraldine's original cost for the home, including furniture, was $41,000. While Reed and Geraldine owned the home in joint tenancy, Geraldine in fact paid the entire cost of the home, including payment after divorce of a $12,000 mortgage placed on the home to acquire funds to expand and refurnish Reed's law office. Geraldine's source of funds was from the sale to her two brothers of her one-third interest in a family livestock partnership which had been given them by her father. The rental value of Geraldine's home for the years 1966 to 1969, inclusive, was as follows: Year
Total Rental Value 1966
$200
1967
220
1968
240
1969
255
The total amounts provided by Reed for support of the children during the years in issue, including the out-of-pocket expenditures incurred by him for the children while they were with him during his visitation rights, and cash payments *24 made to Geraldine, are as follows: Stephen
1966
1967
1968
1969 Out-of-pocket
$ 228.00
$ 265.00
$ 202.00
$ 154.00
Cash payments 900.00
900.00
1,106.30
1,200.00
Total by Reed
1,128.00
1,165.00
1,308.30
1,354.00
Joseph
Out-of-pocket
215.00
224.00
190.00
177.00
Cash payments 900.00
900.00
1,106.30
1,200.00
Total by Reed
1,115.00
1,124.00
1,296.30
1,377.00
Karla
Out-of-pocket
136.00
136.00
124.00
100.00
Cash payments 900.00
900.00
900.00
1,125.00
Total by Reed
1,036.00
1,036.00
1,024.00
1,225.00
John
Out-of-pocket
$ 135.00
$ 141.00
$ 136.00
$ 127.00
Cash payments 900.00
900.00
900.00
900.00
Total by Reed
1,035.00
1,041.00
1,036.00
1,027.00
The total amounts provided by Geraldine (and by Biard where applicable) for support of the children during the years in issue, including each child's pro rata portion of the rental value attributable to Geraldine's home, and the out-of-pocket expenditures, were as follows: Stephen
1966
1967
1968
1969 Net out-of-pocket
$ 573.26
$ 481.33
$ 945.13
$1,365.64
Pro rata portion of rental value of Geraldine's home 480.00
528.00
488.14
510.00
Support by Geraldine (and Biard where applicable)
1,053.26
1,009.33
1,433.27
1,875.64
Joseph
Net out-of-pocket
573.26
542.43
968.08
1,154.78
Pro rata portion of rental value of Geraldine's home 480.00
528.00
488.14
510.00
Support by Geraldine (and Biard where applicable)
1,053.26
1,070.43
1,456.22
1,664.78
Karla
Net out-of-pocket
543.78
481.23
944.57
1,289.75
Pro rata portion of rental value of Geraldine's home 480.00
528.00
488.14
510.00
Support by Geraldine (and Biard where applicable)
1,023.78
1,009.23
1,432.71
1,799.75
John
Net out-of-pocket
418.61
485.90
916.57
1,611.69
Pro rata portion of rental value of Geraldine's home 480.00
528.00
488.14
510.00
Support by Geraldine (and Biard where applicable)
898.61
1,013.90
1,404.71
2,121.69
*25 The following table specifies the amounts expended by Geraldine (and Biard where applicable) for the indicated captioned categories during the years in issue: 1966
1967
1968
1969 Amounts expended for:
Food
$1,946.52
$1,943.03
$3,032.62
$2,967.19
Utilities
556.47
581.02
757.16
904.79
Charitable contributions
529.00
505.50
917.00
1,375.00
Clothing apparel (per child)
160.00
250.60
A maximum of 235.00
235.00
Clothing apparel for Geraldine or Geraldine and Biard
A minimum of 880.00
A minimum of 606.00
A minimum of 617.00
Athletic activities per child
A maximum of 25.00
Athletic activities Geraldine
A maximum of 106.00
Misc. items such as repairs, dry cleaning, veterinarian, education & medical, travel, recreation, hair cuts, music lessons, toys, child care, Boy Scouts, etc.
3,009.43
3,060.02
5,544.37
7,234.18
In each of the years 1966 through 1969, Geraldine received back as change 30 percent of each check that was cashed in supermarkets and/or other grocery stores. With respect to the amounts that Geraldine received back as change from these checks, Geraldine spent only one-third of such change for items that are *26 properly characterized as support items. Accordingly, only 80 percent of the fact amount of these checks is properly characterized as having been expended for support. Geraldine patronized her beauty shop on a regular once-per-week schedule during the years in issue. In early 1965, Reed and two law partners, Richard Wilkins (Wilkins) and M. J. Pritchett (Pritchett) formed a partnership (W-2P Rentals) to acquire some real property in close proximity to downtown Salt Lake City. The partners hoped to acquire the type of property that would make a good long-term investment. In May 1965, the partners acquired three parcels of property, two of which were contiguous. In the same year, Pritchett sold his partnership interest in W-2P Rentals to Reed and Wilkins. Subsequently, in November 1965, Wilkins was killed in an airplane crash. Reed acquired Wilkins' interest in W-2P Rentals from the latter's estate in 1966. In March 1966, W-2P Rentals acquired a fourth parcel of property which was a sandwich parcel to the other three parcels, making the four properties one contiguous entity.The total cost of the properties was $64,203, of which W-2P Rentals allocated $25,303 to land *27 and $38,900 to depreciable improvements. The properties, the dates they were acquired, W-2P Rentals' cost allocated to depreciable improvements (buildings) and the useful lives adopted by W-2P Rentals with respect to the depreciable improvements (buildings) are as follows: W-2P's Allocation of Cost Property
Purchase Price of Property
Useful Life of Property as Adopted by W-2P Rentals (Years)
Date Acquired
Land
Improvements 536-538 S. 3rd East
$17,500
6
May 1965
$7,800
$ 9,700
542 S 3rd East
10,000
6
May 1965
4,400
5,600
544-548 S. 3rd East
19,703
8
March 1966
5,903
13,800
550 S. 3rd East
17,000
6
June 1965
7,200
9,800
In the deficiency notices herein, respondent increased the useful life on each property to 10 years from January 1, 1966, and allocated a smaller portion of the cost of each property to depreciable improvements than was allocated by W-2P Rentals. However, respondent subsequently filed an amended answer asserting shorter useful lives for two of the properties but also asserted even smaller cost allocations to improvements than in the statutory notices, resulting in increased deficiencies. The respective *28 positions taken by respondent and Reed are summarized as follows: Respondent's Determinations Presented in the Amended Answer
Deficiency Notice
Reed's Petition (W-2P Rentals) 536-538 S. 3rd East (Purchase price $17,500)
Land
$14,875
$ 9,900
$ 7,800
Depreciable basis
2,625
7,600
9,700
Useful life
5 years
10 years
6 years
542 S. 3rd East (Purchase price $10,000)
Land
9,500
7,000
4,400
Depreciable basis
500
3,000
5,600
Useful life
5 years
10 years
6 years
544-548 S. 3rd East (Purchase price $19,703)
Land
15,762
9,500
5,903
Depreciable basis
3,941
10,203
13,800
Useful life
10 years
10 years
8 years
550 S. 3rd East (Purchase price $17,000)
Land
14,960
9,900
7,200
Depreciable basis
2,040
7,100
9,800
Useful life
10 years
10 years
6 years
The involved properties (Reed's properties) are located on the west side of Third East Street in a block just south of Metropolitan Square, which consists of the Metropolitan Hall of Justice, city library, and county jail. In the block immediately west of Metropolitan Square and northeast of the subject properties is the old City-County Building. Exactly two blocks west is *29 State Street, the next to highest density commercial street in Salt Lake City, and 1 1/2 blocks north is Fourth South Street, a high density main traffic artery and commercial street. The neighborhood containing Reed's properties (the neighborhood) was rezoned in February 1965 to permit the construction of commercial type buildings in the neighborhood. In 1965 and 1966, the neighborhood was in transition from a residential type use to an eventual higher and better commercial type use for the location of commercial office buildings and high density or apartment complex housing. Most of the properties in the neighborhood (including Reed's properties) consisted of old single-unit dwellings which had been converted to duplexes, triplexes, and fourplexes. The construction of the Metropolitan Square and the Central City Community Center (located in the block just south and east of Reed's properties) had displaced numerous low income and welfare tenants who sought housing in the neighborhood of Reed's properties. This contributed to the transitional character of Reed's properties because of the rental collection problems that resulted from these tenants. The property at 536-538 South *30 was improved with a cottage built in 1890 and converted to a triplex by converting the attic into two living units. The property at 542 South was improved with a single-unit dwelling built in the year 1903 and was condemned at the time of trial. The property at 544-548 South contained an older duplex unit built in 1906 which was in acceptable condition when acquired by W-2P Rentals. The property at 550 South was improved with an older two-story colonial built in about 1900 and condemned on January 1, 1972. W-2P Rentals has had problems in trying to maintain good paying tenants in the subject properties since they were acquired.
ULTIMATE FINDINGS OF FACT During the taxable years 1966 and 1967, Reed supplied more than one-half of the total support received by each of the four children by his former marriage to Geraldine. During the taxable years 1968 and 1969, Geraldine (and Biard where applicable) supplied more than one-half of the total support received by each of the four children by her former marriage to Reed. The proper allocation of the purchase price of Reed's properties to the respective components of land and depreciable improvements and the useful lives of the *31 depreciable improvements as of January 1, 1966, are as follows: Purchase Price
Portion Allocable to Land
Portion Allocable to Improvements
Useful Life (years) 536-538 S. 3rd E.
$17,500
$12,000
$5,500
5
542 S. 3rd E.
10,000
8,500
1,500
5
544-548 S. 3rd E.
19,703
13,703
6,000
9
550 S. 3rd E.
17,000
12,000
5,000
8
OPINION The legal criteria governing the determination of whether Reed or Geraldine is entitled to the dependency exemptions for 1966 are substantially different from those legal criteria which govern the dependency determinations for 1967 through 1969. With respect to the dependency issue for 1966, Reed not only has the burden of proving that he provided more than one-half of each child's support for the year but he must also prove the actual amount of support that was furnished in the aggregate by him and his ex-spouse for each child's support during the year in issue. See Martin Colton, 56 T.C. 471, 473 (1971); and Aaron F. Vance, 36 T.C. 547, 549 (1961). For years subsequent to 1966, however, section 152(e), Internal Revenue Code of 1954, which was adopted in 1967 *32 and which is expressly applicable to post-1966 taxable years, provides generally that the parent having custody of the dependent children for the greater part of the year shall be entitled to the dependency exemptions if that parent did in fact provide more than one-half of each child's total support. [3]
*33 Section 152(e) (2) (B), however, provides an exception to the general rule of section 152(e) (1). Section 152(e) (2) (B) states that the noncustodial parent is entitled to the dependency exemptions where the noncustodial parent provides $1,200 or more for the support of the children and the custodial parent doe not "clearly establish" that he or she provided more for the children's support than did the noncustodial parent. [4]
After carefully *34 reviewing all the facts in the record, [5] we have found, and so hold, that Reed and Geraldine (and Biard where applicable) provided the following respective amounts of support for each of the children during the pertinent years in issue: Support furnished by Reed
1966
1967
1968
1969 Stephen
$1,128.00
$1,165.00
$1,308.30
$ 1,354.00
Joseph
1,115.00
1,124.00
1,296.30
1,377.00
Karla
1,036.00
1,036.00
1,024.00
1,225.00
John
1,035.00
1,041.00
1,036.00
1,027.00
Support furnished by Geraldine (and Biard where applicable)
Stephen
$1,053.26
$1,009.33
$1,433.27
$ 1,875.64
Joseph
1,053.26
1,070.43
1,456.22
1,664.78
Karla
1,023.78
1,009.23
1,432.71
1,799.75
John
898.61
1,013.90
1,404.71
2,121.69
*35 In reaching this decision, we considered in detail the evidence presented by both Reed and Geraldine pertaining to the fair market rental value of Geraldine's home. After considering such factors as the rental value of comparable homes during the years in issue and the fact that the general real estate market in Salt Lake City during 1966 and 1967 was in a depressed state, [6] we concluded that the monthly fair market rental value of Geraldine's home (including furnishings) was $200 in 1966, $220 in 1967, $240 in 1968, and $255 in 1969. Moreover, we are persuaded that the record does not support Geraldine's contention with regard to the amounts claimed by her to have been expended on children's clothing and food during the years in issue. Geraldine is a well-groomed woman who is highly cognizant of her personal appearance. In this context, we cannot accept her *36 contention that she spent only $304 in 1966, $309 in 1968, and $269.50 in 1969 on her personal clothing needs. Accordingly, we have found, and so hold, that Geraldine expended approximately $724.07 in 1966, $606.46 in 1968, and $407.50 in 1969 on her personal clothing needs. [7]
Finally, with respect to the amounts claimed for food during the years in issue, we are not convinced that all of these claimed amounts were expended for food or other grocery items. Geraldine testified that the amounts comprising the food items were computed from checks cashed at supermarkets or other grocery stores. She further testified that 20 to 30 percent of the face amount of the checks cashed at the supermarkets/grocery stores was received back as change. After closely examining Geraldine's testimony in this regard, we have concluded *37 that 80 percent of the face amount of these checks was expended for food or food-related items and, thus, is properly characterized as support items. However, we have concluded that the remaining 20 percent should not be so characterized, and, thus, we have readjusted the food amounts claimed by Geraldine for the years in issue (as indicated in our Findings of Fact) to reflect this conclusion. [8]
Accordingly, after applying the appropriate legal standards for the pertinent years in issue, we have found, and so hold, that Reed is entitled to each of the involved dependency exemptions for the taxable years 1966 and 1967 and that Geraldine is entitled to each of the involved dependency exemptions for the taxable years 1968 and 1969. [9]
*38 Finally, the second issue involves the allocation between land and depreciable improvements of the purchase price of the properties acquired by W-2P Rentals (i.e., Reed's properties). After carefully considering the facts in the record pertaining to this issue, with particular emphasis upon the facts indicating that Reed's properties were located in a transitional neighborhood and that the depreciable improvements situated on these properties were generally in a declining condition, we have found, and so hold, that the proper allocation of the purchase price of Reed's properties to the respective components of land and depreciable improvements, and the useful lives of depreciable improvements as of January 1, 1966, are as follows: Purchase Price
Portion Allocable to Land
Portion Allocable to Improvements
Useful Life (Years) 536-538 S. 3rd E.
$17,500
$12,000
$5,500
5
542 S. 3rd E.
10,000
8,500
1,500
5
544-548 S. 3rd E.
19,703
13,703
6,000
9
550 S. 3rd E.
17,000
12,000
5,000
8
Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Biard E. Anderson and Geraldine Anderson, docket No. 5157-71, and Reed A. Watkins and Jeanette D. Watkins, docket No. 177-72. ↩
2. Geraldine Anderson is also the petitioner of record in a small claims case heard pursuant to the provisions of Rule 36 of the Tax Court Rules of Practice.↩ The dependency exemption issue in the small claims case is related to the dependency exemption issue in the instant cases. The taxable year involved in the small claims case is 1967. 3. Sec. 152(e) (1) provides in pertinent part as follows: Sec. 152(e) Support Test in Case of Child of Divorced Parents, Et Cetera. - (1) General rule. - If - (A) a child (as defined in section 151(e) (3)) receives over half of his support during the calendar year from his parents who are divorced or legally separated under a decree of divorce or separate maintenance, or who are separated under a written separation agreement, and (B) such child is in the custody of one or both of his parents for more than one-half of the calendar year, such child shall be treated, for purposes of subsection (a), as receiving over half of his support during the calendar year from the parent having custody for a greater portion of the calendar year unless he is treated, under the provisions of paragraph (2), as having received over half of his support for such year from the other parent (referred to in this subsection as the parent not having custody). ↩
4. Sec. 152(e) (2) (B) provides in pertinent part as follows: Sec. 152(e) Support Test in Case of Child of Divorced Parents, Et Cetera. - * * * (2) Special Rule. - The child of parents described in paragraph (1) shall be treated as having received over half of his support during the calendar year from the parent not having custody if - * * * (B) (i) the parent not having custody provides $1,200 or more for the support of such child (or if there is more than one such child, $1,200 or more for all of such children) for the calendar year, and (ii) the parent having custody of such child does not clearly establish that he provided more for the support of such child during the calendar year than the parent not having custody. ↩
5. Although we would not normally comment as such, we believe that the following observation is merited in the context of the instant case. It is apparent that one of the parties, influenced primarily by the hostilities emanating from the marital breach, intransigently and unreasonably refused to settle the dependency exemption issue. Such recalcitrance is intolerable where, as in the instant case, it compels us to make a Solomon-like pronouncement in arbitrating a personal problem that should have been resolved by the participating parties. ↩
6. Geraldine's expert witness testified on direct examination as follows: "[In] 1966 and in 1967 we were in what we would call in the real estate business, a buyer's market. Therefore, the rental situation is more difficult. You receive less for your property than you would in the present market as of today." ↩
7. Although we regard Geraldine's contention that she spent only $93.10 on her personal clothing wardrobe for 1967 as somewhat incredulous, we have accepted this figure in view of the fact that we did substantially readjust her 1966 clothing expenditures. In this context, it is conceivable that her 1967 personal clothing needs may have been almost nonexistent. ↩
8. For the year 1968, we also did not believe that Geraldine spent only $41.20 on her own personal recreational activities. After reviewing her testimony in this regard, we are convinced that she spent at least $106 on her own skiing lessons, related skiing equipment, etc. ↩
9. It should be noted that Reed contended that neither the monetary contributions to the Church of Latter Day Saints nor the monies emanating from Biard after his marriage to Geraldine should be included in the computation of the support amount attributable to Geraldine. We are not persuaded by either of these contentions. See, e.g., Martin Colton, 56 T.C. 471, 475↩ (1971).